## APPEAL OF LENOX LAND CO.

Docket No. 1083.   Promulgated January 26, 1927.

Value of a leasehold at date paid in to a corporation for stock and of the same property at March 1, 1913, determined for invested capital and exhaustion purposes.

*W. H. Cloud, Esq.*, and *Eugene M. Lynn, C. P. A.*, for the petitioner.

*Arthur J. Seaton, Esq.*, for the Commissioner.

This is an appeal from the determination of a deficiency in income and profits taxes for the year 1920, in the amount of $8,278.65. The questions involved are the value at the date of acquisition of a certain leasehold for invested capital and its value at March 1, 1913, as the basis for a deduction for exhaustion.

### FINDINGS OF FACT.

The petitioner is a Missouri corporation with its principal place of business in Kansas City. It was incorporated on December 15, 1904, with a paid-up capital in the amount of $50,000.

On February 5, 1895, R. C. and Hannah T. Walpole leased the land in question to Willard Carl Feld for a term of 99 years, beginning August 12, 1895, and ending August 12, 1994. This lease reserved a rental of $6,000 per year for the first ten years, and provided for an appraisal at the expiration of such term, and of each succeeding ten-year period, and that the annual rental to be reserved for each term should be 6 per cent of the appraised value. The lessee was empowered to improve the property as he might desire, and it was provided that he should own all improvements, conditioned upon his payment of all rents due, and taxes and assessments. If he surrendered the lease or defaulted in any payment to which he was obligated thereunder between any valuation dates, all improvements were to become the property of the lessor.

The lease contained the following provision for cancellation and surrender at the end of any revaluation period:

Said Feld, his heirs, representatives or assigns, shall have the right and privilege of improving said property as he or they may desire, and he or they shall have the right and privilege of surrendering this lease and terminating this tenancy at the expiration of any period of ten years for which said real estate may have been appraised, as above provided, and upon the payment of any and all rent which may be due upon said premises and of any and all taxes and assessments, general and special, which may be assessed or levied upon said property, he or they shall own all improvements which may have been placed upon said lot and shall have the right and privilege of removing the same therefrom.

On August 17, 1899, Jeremiah S. Lillis, representing the Lillis family, purchased the leasehold for a consideration of $53,000. Prior to 1905, title to the fee was acquired from the Walpoles by Ada M. Pulliam. On April 28, 1905, an agreement was entered into by Pulliam and Lillis, the then parties in interest, which modified the original lease as follows: Rental from August 12, 1905, to August 12, 1915, was fixed at $10,000 per year, and from the latter date to August 12, 1925, at $12,000 per year; within two years from date the lessee was to begin the construction of a building on the leased lot at a cost of not less than $30,000. Pursuant to this condition, Lillis erected a building, which was completed early in 1908, at a cost of $105,091.80.

On March 17, 1908, the petitioner acquired the leasehold and building, and in payment therefor issued all of its capital stock of the par value of $50,000 for distribution among the members of the Lillis family. On March 20, 1916, the petitioner and the owner of the fee agreed to the cancellation of the provisions for tenth-year appraisals and substituted therefor an agreement that the rental for the remainder of the term of the lease subsequent to August 13, 1925, should be $20,000 per year, payable in equal monthly installments. As consideration for the abrogation of the reappraisal provisions of the lease, the petitioner paid the owner of the fee the amount of $30,000, which the parties to this appeal agree is to be regarded as a part of the cost of the leasehold. On October 3, 1919, the petitioner sold the building for $100,000, under a contract to retain possession and the receipt of all rentals from subleases until July 31, 1925, on terms and conditions that are not material to the issues involved in this appeal.

From 1908 until January 1, 1913, the petitioner operated the property in its own interest and received gross rentals as follows: 1908, $48,499.65; 1909, $53,087.89; 1910, $56,713.21; 1911, $59,077.42; 1912, $56,253.42. From 1913 until 1918, inclusive, the rentals varied from $41,083.31 to $48,610.39, and from 1919 to 1924, the gross average

annual rental was $45,000. From 1908 to 1912, inclusive, the average net income from the property was $31,659.20 per annum.

The leasehold covers a lot located at the southwest corner of the intersection of Eleventh and Walnut Streets in Kansas City, Mo., and is within what real estate men call the "100 per cent" downtown business district of that city, in which land values are rapidly increasing. At the time of the acquisition of the leasehold by the petitioner, the city had a population of 230,000, which was rapidly increasing. The lot is one of the best business locations in the city.

In its income and profits-tax return for 1920, the petitioner claimed a value for the leasehold in the computation of its statutory invested capital in the amount of $400,000 as of the date of its acquisition. Upon the audit of such return, the Commissioner reduced the value of the leasehold to $191,364.80 at March 17, 1908, and determined the deficiency for 1920, and from such determination this appeal is taken.

The depreciated cost of the improvements on the leasehold at March 1, 1913, was $94,582.60.

The actual cash value of the leasehold acquired by the petitioner on March 17, 1908, was, on that date $225,000, and at March 1, 1913, it had a fair market value of $160,000.

## OPINION.

LANSDON: Each party insists that the only problem presented is the determination of the cash value of the leasehold in question when it was acquired by the petitioner in exchange for shares of stock at March 17, 1908. At the same time the parties agree that such valuation must be the basis for the computation of the petitioner's invested capital, and also for the determination of the annual exhaustion of the capital value of the leasehold. In the light of the statutory provision for excess-profits credits and of the rule established by the Board in the *Appeal of Grosvenor Atterbury*, 1 B. T. A. 169, and the *Appeal of Hotel de France Co.*, 1 B. T. A. 28, it is obvious that we must find the value at March 17, 1908, as an element of invested capital, and at March 1, 1913, as a basis for annual exhaustion for years subsequent thereto.

The petitioner contends that at March 17, 1908, the leasehold had a value of not less than $400,000. In our judgment the facts adduced are not sufficient to establish such value. The leasehold cost the petitioner $53,000 in 1895. Early in 1908, the property was improved by the completion of a six-story steel and brick building at a cost of $105,991.80. At March 17, 1908, little, if any, income had been received from the improved property, but space in the building had been leased on terms that yielded an average annual net income

for the years 1908 to 1912, inclusive, in the amount of $31,659.20. All such income accrued subsequent to the date with which we are concerned, and, while it may have some weight as corroborative evidence of value ascertained by appraisement or otherwise, it is clear that it can not be used as the basis for our determination. It is necessary, therefore, to resort to collateral evidence, and to consider the opinion of a witness reputed to be an expert in the valuation of real property in Kansas City.

In support of its contention the petitioner called three witnesses— a real estate operator and two certified public accountants. The real estate man testified that the entire property, made up of the fee, the leasehold, and the building, had a value of $800,000 at March 17, 1908. He was unable to show that any sales of similar property in the same locality at about the same time supported his estimate. With $800,000 as the basis of his computation, and, taking into consideration the rentals reserved and also the peak rental which was not established until 1919, the witness estimated the value of the fee to have been $280,000. He arrived at this figure by capitalizing its earnings at 5 per cent. Subtracting the amount so obtained and the cost of the building from the assumed basic value of $800,000, he reached the conclusion that the leasehold had a value of $415,000 at the date of acquisition.

The first accountant corroborated the testimony of the real estate operator. By applying Hoskold's formula for finding the present worth of future income to the average net annual receipts from subleases for the five years from 1908 to 1912, inclusive, and subtracting the cost of the building from the result, he arrived at a value of $415,000. The second accountant testified that a 99-year lease is in effect a title to the fee, and that annual reductions from reserved rentals for the purpose of extinguishing capital value are so small that for all practical purposes they may be ignored.

The Commissioner contends that the leasehold had a value of only $191,364.80 at the date of its acquisition. To support his estimate he proved that a leasehold on an equally desirable property just across the street, on which ground rentals in the amount of $20,000 were reserved, was sold for $100,000 at about the time the petitioner acquired the property in question, but offered no other evidence to sustain his position.

We are unable to accept either the petitioner's or the Commissioner's estimates of value. The methods used by witnesses for the petitioner are empirical and involve so many doubtful and unknown factors that they can not safely be used as the basis for our determination. The Commissioner's argument that the value should be measured by the selling price of a 99-year lease on a similar property

just across the street is of slight weight, since cross examination of witnesses disclosed that such sale was made in conditions that prevented the owner from realizing full market value for the property.

We are convinced that the leasehold in question had a fair market value at March 17, 1908, in excess of the amount found by the Commissioner, but substantially less than that asserted by the petitioner, and we have fixed such value at $225,000, which should be included in the petitioner's invested capital for the taxable year. It is in evidence that at March 20, 1916, the petitioner paid the owner of the fee $30,000 in consideration for certain modifications in the terms of the lease. The payment was made from surplus or from additional amounts paid in to the petitioner by its stockholders, and, in either event, should be included in the computation of the petitioner's statutory invested capital for the taxable year.

Having determined the value of the leasehold in question for invested capital purposes at March 17, 1908, and at January 1, 1919, it now becomes necessary to ascertain its value at March 1, 1913, as a basis for annual deductions for exhaustion.

Before we proceed with a computation of value we must first determine the term of years to be used as the time factor of our calculations. In the light of all the conditions contained therein, is the lease for a term of $81\frac{1}{2}$ years or $12\frac{1}{2}$ years from March 1, 1913? Do the recapture clauses constitute a practical termination of the lease at the end of each revaluation period? A careful study of the terms of the instrument here in question indicates that it is no more than a lease for ten years, in which the lessor grants the lessee an option of renewal on certain conditions that are specifically set forth. The lessee is under no obligation to renew his tenancy at any rental fixed in the lease or in advance of the reappraisal provided. Without action and acceptance on its part of new terms that never can be known in advance of ten-year appraisals, the lessee is free to retire and remove his property from the ground. So far as it relates to any term beyond which a revaluation of the ground has been made and a new rental rate accepted by the lessee, the instrument is a unilateral contract unenforceable against the lessee, who has perfect liberty to exercise his option and continue his tenancy under the new terms fixed by appraisal or to withdraw if his interests or inclinations prompt such action.

We can not know that the net differential between ground rental and income from subleases will continue beyond the first recapture date. By that time it is fair to assume that 6 per cent on the increasing value of the fee will absorb most of the differential. During the same period the building will have depreciated physically and will have become more and more unsuitable for profitable business uses, and, by 1925, it will be necessary to expend large amounts in modern-

izing the original structure or in its demolition and the construction of a new building in keeping with the economic possibilities of the location. It is impossible to forecast the effect of these factors on the differential in rentals which may be entirely absorbed or greatly increased, but it is so indefinite and uncertain that it can not be used as a factor in computing value for the leasehold beyond the recapture date at which the lessee has the privilege of cancellation and surrender. We are of the opinion, on the evidence, that the value of the leasehold at March 1, 1913, should be computed on the basis of the 12½ years to elapse before another revaluation is due to be made.

In arriving at the value at March 1, 1913, of the leasehold here in question, which we have set forth in our findings of fact, we have considered ground rentals, gross income for the five years preceding that date, the differential between ground rentals and gross income, the capital value of the improvements, and the remaining effective term of the lease. The petitioner is entitled to annual deduction from its gross income of aliquot parts of $160,000 from March 1, 1913, to July 28, 1925.

*Judgment will be entered on 15 days' notice, under Rule 50.*